**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**ISSAC MCBRIDE**                                                                 **PLAINTIFF**

**VS.**                                    **CASE NO. 4:17-CV-378-KGB**

**ARKANSAS DEPARTMENT OF**                                          **DEFENDANT**
**HUMAN SERVICES**

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

For his statement of undisputed material facts, Defendant states:

1.      Plaintiff, Issac McBride, filed a Complaint pursuant to 42 U.S.C.S. § 2000e, et seq. (Title VII of the Civil Rights Act of 1964, as amended) and to the Fourteenth Amendment to the United States Constitution against Defendant, Arkansas Department of Human Services ("DHS").  (Doc. No. 1)

2.      In the Complaint, Plaintiff alleged that he was terminated by DHS, Department of Youth Services ("DYS") on the basis of his race.  (Doc. No. 1)

3.      Plaintiff was employed with DYS as a quality assurance coordinator for approximately 18 years.  (Ex. "F", *Excerpts of Deposition of Issac McBride*, 9:25)

4.      On August 4, 2016, Henry Thompson, Assistant Director of Residential Service, was Mr. McBride's supervisor and Carmen Mosley-Sims, Assistant Director of Community Service, was Mr. Thompson's supervisor.  (Ex. "A", ¶ 1)

5.      DYS Quality Assurance Unit is responsible for conducting all compliance monitoring of DYS contracts and is the custodian of all records relating to contractual compliance.  (Ex. "A", *Affidavit of Carmen Mosley-Sims*, ¶ 2).  Quality assurance coordinators monitor the juvenile facilities by looking at the different situations for the standards of that facility.  They are responsible for making sure that the juveniles' therapists and caseworkers are

working with the juveniles in a timely manner, looking at the physical plan, and checking to assure the safety and security of the juveniles.  They perform audits of the facilities and do reports on their findings.  Generally, they are responsible for assuring the safety of the children. (Ex. "F", 9:24; 10:1-14)

6.      At noon on Thursday, August 4th, Ms. Mosley-Sims asked members of the Quality Assurance team to assist in pulling records pursuant to a grand jury subpoena.  (Ex. "A", ¶ 2; Ex. "I", *Subpoena to Testify Before a Grand Jury*)

7.      The requested records were related to contract compliance monitoring of South Arkansas Youth Services ("SAYS") which is a provider for DYS.  (Ex. "A", ¶ 2)

8.      On August 4th, Mr. McBride was at his desk in the unit when he volunteered to pull the records.  (Ex. "A", ¶ 3; Ex. "B", ¶ 8)

9.      Mr. McBride went to the file cabinets on the far side of the office to pull the records.  In spite of the fact that the records were available on the computer shared drive, Mr. McBride was manually pulling them.   (Ex. "F", 11:16-19).   It was not necessary for Mr. McBride to pull hard copy files.  (Ex. "F", 13:10; 14:10; 15:21)

10.     Mr. McBride and Ms. Mosley-Sims discussed the records request at least one time on that day to clarify the scope of the request.  By the end of the day, Mr. McBride had not produced the records, leaving the office for the day without speaking to Ms. Mosley-Sims again. (Ex. "A", ¶ 4)

11.     At the beginning of the day on Friday, August 5th, Ms. Mosley-Sims began looking for Mr. McBride to advise him that she needed the records no later than noon that day. Mr. McBride's computer activity and his co-workers indicated that he was at work.  Ms. Mosley-Sims could not find Mr. McBride in the office; therefore, Tommy Branch, another quality

assurance coordinator, looked for Mr. McBride but couldn't find him either.  (Ex. "A", ¶ 5; Ex. "B", ¶ 9)

12.     Ms. Mosley-Sims emailed Mr. McBride and his supervisor, asking for his location.  When she didn't get a response, she asked Mr. Branch to pull the records.  (Ex. "A", ¶ 5)

13.     Before noon that day, Mr. McBride and Mr. Branch gave the requested records to Ms. Mosley-Sims.  Mr. McBride responded to Ms. Mosley-Sims by email, stating that he had been on the other side of the building when Ms. Mosley-Sims was looking for him.  (Ex. "A", ¶ 5)

14.     In the afternoon of Friday, August 5th, Mr. Branch informed Ms. Mosley-Sims that he had received a call from Jerry Walsh, executive director of SAYS, and he left a message indicating that he was trying to reach Mr. Branch.  (Ex. "A", ¶ 6; Ex. "B", *Affidavit of Tommy Branch*, ¶ 12).  Mr. Walsh called Mr. Branch a second time that day but did not leave a message. (Ex. "H", *Affidavit of Ashley Griesemer*, ¶ 5E; Ex. "1" attached to Ex. "H", *Executive Summary*)

15.     Mr. Branch he did not return Mr. Walsh's call.  Mr. Branch instead called Mr. McBride, at the direction of Mr. Thompson, and asked him about the call from Mr. Walsh and asked whether Mr. McBride had talked to Mr. Walsh that day.  (Ex. "A", ¶ 6).

16.     Mr. Branch said that Mr. McBride avoided the question and hesitated to answer the question and seemed anxious and flustered, at first.  Mr. Branch asked Mr. McBride about the call again.  Mr. McBride then stated that he called Mr. Walsh to check on his wife who was in the hospital.  (Ex. "A", ¶  6; Ex. "B", ¶ 13)

17.     Ms. Mosley-Sims and Mr. Thompson directed Mr. Branch not to respond to anymore calls from Mr. Walsh.  (Ex. "A", ¶ 6; Ex. "B", ¶ 7)

18.     Mr. McBride and Mr. Walsh knew each other for approximately 20 years. (Ex. "E", *Declaration of Cindy Snider*, ¶ 3).  Mr. McBride and Mr. Walsh were associates, professionally, as well as close friends, even before Mr. McBride worked for DYS.  (Ex. "E", ¶ 3; Ex. "F", 47:18-24; 40:15-25; 41:1-5).  Mr. McBride and Mr. Walsh would talk to each other on a regular basis.  Ms. Snider, an assistant to Mr. Walsh, would hear their conversations on the speaker phone.  (Ex. "E", ¶ 3)

19.     Mr. McBride was a coach of the AAU Arkansas Wings basketball team.  While Mr. McBride was employed with DYS, Mr. Walsh offered to donate money to the Arkansas Wings.  (Ex. "G", 32:20-24).  Mr. McBride accepted Mr. Walsh's offer of donations and Mr. Walsh and SAYS have made multiple donations to Mr. McBride and the Arkansas Wings.  (Ex. "G", 25:11-13; Ex. "F", 45:19-24).

20.     The donations for the basketball team are directed to the AAU director and then to the coaches.  (Ex. "F", 42:5-6).  Mr. Walsh would mail a check for the donations to Mr. McBride.  (Ex. "G", 33:7-16)

21.     The donations to Mr. McBride and the Arkansas Wings were for the purpose of paying for uniforms, meals, hotel expenses, and other expenses.  (Ex. "F", 44:15-25; 45:1).  As a coach, Mr. McBride personally benefited from the payment of the expenses.

22.     Mr. McBride would ask DYS providers for money for his basketball team.  (Ex. "B", ¶ 6).  Mr. McBride told Mr. Branch that he was going to pick up a check from certain providers for his team.  Mr. McBride would talk openly about going to pick up a check.  (Ex. "B", ¶ 6)

4

23.     Mr. McBride called Mr. Walsh on Thursday, August 4th or Friday, August 5th, and told him they were pulling records of SAYS.  (Ex. "A", ¶ 12)

24.     If SAYS had been awarded the DYS contracts for 2016, it would be in the amount of $70 million.  (Ex. "G", 12:6-10)

25.     Mr. Thompson made the determination to immediately pull Mr. McBride off any monitoring assignments.  (Ex. "A", ¶ 7)

26.     Ms. Mosley-Sims decided to place Mr. McBride on administrative leave pending a review of the matter.  (Ex. "A" ¶ 7)

27.     At a meeting on Monday, August 8, Mr. Thompson and Ms. Mosley Sims informed Mr. McBride about the administrative review.  Ms. Mosley-Sims specifically instructed Mr. McBride not to discuss the administrative review with anyone within or outside DHS.  In addition, he was told not to discuss any work related matter with any person unless requested to do so by his supervisors.  (Ex."A", ¶ 8)

28.     Later, Mr. Branch received a phone call from, an Arkansas state representative inquiring about the investigation of Mr. McBride.  The state representative asked about Mr. McBride's job situation.  (Ex. "A", ¶ 9; Ex. "B", ¶ 15).

29.     On August 8th, Mr. McBride called Mr. Walsh to tell him that he had been placed on administrative leave or termination.  (Ex. "G", 48:12-25).  Mr. McBride was unable to reach Mr. Walsh. (Ex. "G", 49:1-16; 50:3-4).

30.     On August 8th, Mr. McBride called Ms. Snider on her cell phone.  (Ex. "E", ¶ 4). Mr. McBride said to Ms. Snider: "Where is Jerry, I need to talk to him immediately.  Could you call him and tell him to call me.  I'm getting fired for talking to Jerry about the contract."   (Ex.

"E", ¶ 4).  Mr. McBride had already tried Mr. Walsh's cell phone but couldn't reach him.  (Ex. "E", ¶ 4)

31.     Ms. Snider then called Mr. Walsh and told him that Mr. McBride was trying to get in touch with him.  Ms. Snider told Mr. Walsh that he needed to call Mr. McBride.  (Ex. "A", ¶ 4).  Mr. Walsh called Ms. Snider back directly and said he talked to Mr. McBride and that DYS was blaming Mr. McBride for letting him know that he wasn't getting the contract.  (Ex. "E", ¶ 4).  Mr. Walsh was astounded when he heard of Mr. McBride's job situation.  (Ex. "G", 48:23-25; 49:1-2)

32.     Mr. Golden indicated that further developments had occurred that morning as a complaint had been received, alleging that someone at DYS had informed Mr. Walsh that SAYS would not be awarded certain residential facility contracts that were at that time undergoing procurement.  (Ex. "A". ¶ 10)

33.     On Tuesday, August 9th, Ms. Mosley-Sims raised the potential breach of information, by Mr. McBride, with executive staff at DYS, including the director, Betty Guhman, and the assistant director for residential services, Marq Golden.  (Ex. "A", ¶ 10)

34.     This being strictly confidential information, the alleged breach was a serious matter.  (Ex. "A", ¶ 10)

35.     On Wednesday, August 10, 2016, Ms. Mosley-Sims asked the DHS Office of Internal Affairs/Fraud Investigations ("OIA") to conduct a factual investigation of the matter because of its sensitivity.  (Ex. "A", ¶ 11)

36.     The OIA investigator, Ashley Griesemer, conducted an investigation, interviewing persons with direct knowledge of the relevant incidents in the case, including Mr.

McBride, Tommy Branch, Marq Golden (manager of the quality assurance unit) Henry Thompson, and the complainant from SAYS who asked to remain confidential. (Ex. "A", ¶ 11)

37.     On review of the investigative report, it was clear to Ms. Mosley-Sims that Mr. McBride did, in fact, speak to SAYS director, Mr. Walsh, sometime on August 4th or 5th, 2016 and informed him that records regarding his organization were being pulled. (Ex. "A", ¶ 12)

38.     Mr. McBride inappropriately shared information that he was only privy to by virtue of his position at DYS. This inappropriate sharing of information created an appearance of ethical violation and impropriety. (Ex. "A", ¶ 12)

39.     The evidence from multiple sources that this conduct is part of a larger pattern or behavior in which Mr. McBride fraternizes with Mr. Walsh and perhaps other providers (entities he is responsible for monitoring for contractual compliance) and requests donations from them to support his basketball team. (Ex. "A", ¶ 13)

40.     The investigator asked Mr. McBride to provide his cell phone records to support his contention that he did not call Mr. Walsh on those dates. Mr. McBride agreed to do so but later that day called to refuse to provide the records. He was found to be not credible in his denial of having called or in the reason he initially claimed to have called. (Ex. "A", ¶ 14)

41.     On August 8th, Mr. McBride was informed of the administrative review and he was placed on leave. He was directed at that time not to discuss the investigation or any work-related matter with any outside person. (Ex. "A", ¶ 16)

42.     Mr. McBride deliberately ignored and failed to comply with directives from his supervisors with respect to responding to requests for information/FOIA, discussing or sharing information regarding the residential contract procurement, and discussing the administrative review and work-related matters while on administrative leave. (Ex. "A", ¶ 18)

43.     Lynne Bowen was the DYS grievance officer who conducted the grievance hearing for Mr. McBride's involuntary termination.  An administrative hearing was held on November 16, 2016. (Ex. "D", *Affidavit of Lynne Bowen*, ¶ 2)

44.     Ms. Bowen found that Mr. McBride violated DHS Policy 1081(I) – Ethical Standards for DHS employees, Employee Conduct.  (Ex. "D", ¶ 5)  Mr. McBride made an unsolicited call to Mr. Walsh during the timeframe when SAYS records were being pulled.  (Ex. "D", ¶ 5).  Mr. McBride used his position to accept donations from Mr. Walsh for his AAU basketball team that resulted in the appearance of impropriety.  (Ex. "D", ¶ 5)

45.     Mr. McBride violated DHS Policy 1084.3.1 – Integrity and Honesty which violation would alone warrant termination.   Mr. McBride committed two misstatements of fact during the OIA investigation.  He was asked if he knew of any phone calls made to Mr. Walsh on or about the 4th or 5th of August and he replied "no".   Later in the interview and in his testimony under oath at the hearing, Mr. McBride admitted to calling Mr. Walsh to check on his hospitalized wife.  (Ex. "D", ¶ 6)

46.     Mr. McBride committed a misstatement of fact when he said in his interview that Mr. Walsh had never donated money to Mr. McBride's basketball team and he replied: "Not that I recall."  Mr. Walsh testified at the grievance hearing that he did donate to the AAU basketball team.  (Ex. "D", ¶ 6)

47.     Mr. McBride violated DHS Policy 1084.3.2.  Marq Golden, an assistant director for residential services, received a call from Ms. Snider stating that somebody from DYS had informed Mr. Walsh that SAYS would not be awarded a contract.  (Ex. "D", ¶ 7)

48.     Jocelyn Potter is employed in DYS Human Resources.  Ms. Potter researched and provided information concerning certain DYS employees who are alleged to be comparators. (Ex. "C", *Affidavit of Jocelyn Potter*)

49.     Michael Poole is a former DYS employee who worked in the IT Division as a Computer Support Technician.   His job responsibilities were: installing software, printers, scanners and troubleshoot reported errors, assist employees with any issues with desktop, printers, etc.  His supervisor was Barry Rowland.  Mr. Poole did not drive a state vehicle while intoxicated.  Mr. Rowland would have known about that.  (Ex. "C", ¶ 3a)

50.     Adam Baldwin is a current DYS employee who worked in the System Reform Division as a System Reform Manager.  The System Reform Division was created to advance the cause of juvenile justice in the state by (1) providing trainings for providers and all people in the juvenile justice system in Arkansas, (2) unifying juvenile justice practices across the state, and (3) developing relationships with national entities and bringing them into the state.   His supervisor during the pertinent time was Steve Nawoczyk.  He received counseling for abuse of time allegations.  (Ex. "C", ¶ 3b)

51.     Steve Nawoczyk is a former employee.   He worked in the System Reform Division as a System Control Manager.  His supervisor was Carmen Mosley-Sims.  He was not abusing his time while Ms. Mosley-Sims was supervising him.  He and his staff were out of the office often because they were doing training and workshops.  (Ex. "C", ¶ 3c).  Ms. Mosley-Sims always knew where Mr. Nawoczyk and his staff were and what they were doing.

52.     Debbie Garland is a former DYS employee.   She worked in the Education Division as a Records Management Analyst.   The Education Division is responsible for educating adjudicated youth during time of incarceration.  Her supervisors were James Walker

and Michael O'Leary.  She was terminated for gross misconduct.  Her misconduct included: bringing a gun to the workplace, discourteous treatment of others, and unprofessional behavior via email.  (Ex. "C", ¶ 3d)

53.    Michael O'Leary is a former DYS employee.  He worked in the Education Division as an Assistant Superintendent.  His supervisor was Brett Smith.  Ms. Potter is not aware of any misconduct necessitating discipline.  (Ex. "C", ¶ 4d)

54.    Brett Smith is a current DYS employee.  He works in the Education Division as a Superintendent.  During the relevant time period, Marcella Dalla Rosa was his supervisor and prior to her was James Washington.    He was disciplined by being demoted for unauthorized purchase of a Vo-Tech program.  (Ex. "C", ¶ 3e)

55.    Mr. McBride is not aware of any DHS employees who ever made a racially derogatory comment to him.  (Ex. "F", 48:20-24).

56.    Mr. McBride has not seen anybody write anything, an email or any racially derogatory comment from a DHS employee.  (Ex. "F", 49:16-20).

57.    Mr. McBride does not remember hearing any racially derogatory comment towards any other employee of DHS.  (Ex. "F", 49:21-23).

58.    Mr. McBride has never heard any DHS employee use the "N" word.  (Ex. "F", 50:1-9).

59.    Mr. McBride has never heard that any DYS Caucasian employees are harder working than African-American employees.

60.    Mr. Walsh and Mr. McBride talked about Mr. McBride's lawsuit approximately

one month before Mr. Walsh's deposition which was after Mr. McBride's deposition.  (Ex. "G", 44:16-22).  The conversation was about the contract and that Mr. Walsh knew early on that he was not going to get the contract.  (Ex. "G", 45:1-22)

Respectfully submitted,

Leslie Rutledge
Attorney General

By:      /s/ Robert T. James
         Arkansas Bar No. 91008
         Assistant Attorney General
         323 Center Street, Suite 200
         Little Rock, Arkansas 72201
         Telephone: (501) 682.3658
         Fax: (501) 682.2591
         robert.james@arkansasag.gov

         *Attorneys for Arkansas Department of Human Services*

## CERTIFICATE OF SERVICE

I, Robert T. James, Assistant Attorney General, hereby certify that on November 26, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

Austin Porter, Jr.
Porter Law Firm
323 Center Street, Suite 1035
Little Rock, AR 72201

/s/ Robert T. James
Robert T. James