# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

ISSAC MCBRIDE                                                                    PLAINTIFF

v.                                   Case No. 4:17-cv-00378-KGB

ARKANSAS DEPARTMENT OF
HUMAN SERVICES                                                                   DEFENDANT

## OPINION AND ORDER

Plaintiff Issac McBride brings this action against defendant Arkansas Department of Human Services ("ADHS") under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1983, the Fourteenth Amendment of the United States Constitution, and 28 U.S.C. § 2201 (Dkt. No. 1). Mr. McBride seeks damages as well as declaratory, equitable, and injunctive relief (*Id.*). Before the Court is ADHS's motion for summary judgment on all claims (Dkt. No. 13). Mr. McBride responded in opposition (Dkt. No. 21), and ADHS replied (Dkt. No 24). For the reasons that follow, the Court grants in part and denies in part ADHS's motion for summary judgment (Dkt. No. 13).

## I.      Factual And Procedural Background

Unless otherwise noted, the following facts are taken from ADHS's statement of undisputed material facts (Dkt. No. 14) and Mr. McBride's response to ADHS's statement of undisputed facts (Dkt. No. 22).

Mr. McBride filed a complaint pursuant to Title VII and the Fourteenth Amendment to the United States Constitution against defendant ADHS (Dkt. No. 22, ¶ 1). In the complaint, Mr. McBride alleges that he was terminated by ADHS, Department of Youth Services ("DYS"), on the basis of his race (*Id.*, ¶ 2). Mr. McBride was employed with DYS as a quality assurance coordinator for approximately 18 years (*Id.*, ¶ 3). On August 4, 2016, Henry Thompson, assistant

director of Residential Service, was Mr. McBride's supervisor, and Carmen Mosley-Sims, assistant director of Community Service, was Mr. Thompson's supervisor (*Id.*, ¶ 4). DYS Quality Assurance Unit is responsible for conducting all compliance monitoring of DYS contracts and is the custodian of all records relating to contractual compliance (*Id.*, ¶ 5). Quality assurance coordinators monitor the juvenile facilities by looking at the different situations for the standards of that facility (*Id.*). They are responsible for making sure that the juveniles' therapists and caseworkers are working with the juveniles in a timely manner, looking at the physical plan, and checking to assure the safety and security of the juveniles (*Id.*). They perform audits of the facilities and do reports on their findings (*Id.*). Generally, they are responsible for assuring the safety of the children (*Id.*).

The parties disagree about events that occurred on Thursday, August 4, 2016. ADHS contends that, at noon on Thursday, August 4, 2016,[1] Ms. Mosley-Sims asked members of the quality assurance team to assist in pulling records pursuant to a grand jury subpoena (Dkt. No. 14, ¶ 6). ADHS submits that Mr. McBride was at his desk in the unit when he volunteered to pull the records (*Id.*, ¶ 8). Mr. McBride contends that, on Thursday, August 4, 2016, he was sitting at his cubicle when Ms. Mosley-Sims came to his work area and stated that she needed some records pulled for two of the providers (Dkt. No. 22, ¶ 6). Mr. McBride asserts that, at the time that Ms. Mosley-Sims made the request, he was the only quality assurance coordinator in the area, so he got up and started pulling the records (*Id.*). Mr. McBride maintains that, because he was the only person in the area, he interpreted the request as being directed to him (*Id.*, ¶ 8).

---

[1] ADHS does not specify a year in paragraph six of ADHS's statement of undisputed material facts, but the Court understands and interprets "Thursday, August 4th" as Thursday, August 4, 2016.

The parties agree that the requested records were related to contract compliance monitoring of South Arkansas Youth Services ("SAYS"), which is a provider for DYS (Dkt. No. 22, ¶ 7). Mr. McBride adds that the two providers he was asked to pull records on were SAYS and Youth Bridge (*Id.*, ¶ 6). According to Mr. McBride, pulling records on providers is routinely done, and the records he was asked to pull were prior audits that had been done in previous years (*Id.*). Mr. McBride asserts that he was asked to pull prior audits from 2013 to 2016 (*Id.*). He claims that Ms. Mosley-Sims never told him why she needed the records and that he put the requested records in Ms. Mosley-Sims's office the next morning (*Id.*). Mr. McBride submits that pulling records is something that the quality assurance coordinators are asked to do all the time and that "it is pretty routine" and "nothing out of the ordinary" (*Id.*). Mr. McBride maintains that he was not aware that there was a Federal Bureau of Investigation ("FBI") investigation regarding SAYS at the time that he was pulling the records (*Id.*).

The parties disagree about the storage location of the requested records. ADHS contends that Mr. McBride went to the file cabinets on the far side of the office to pull manually the records despite the fact that the records were available on the computer shared drive (Dkt. No. 14, ¶ 9). ADHS maintains that it was not necessary for Mr. McBride to pull hard copy files. Mr. McBride argues that Ms. Mosley-Sims requested records from 2013 to 2016 and that the older records from 2013 had not been scanned into the computer "U-drive," which meant that they had to be pulled manually (Dkt. No. 22, ¶ 9). Mr. McBride asserts that he spent most of the afternoon of Thursday, August 4, 2016, pulling the older records, which were in file cabinets (*Id.*). He claims that, on Friday morning, August 5, 2016, he pulled the newer records off the computer system and then placed the records on Ms. Mosley-Sims's chair (*Id.*).

ADHS contends that Mr. McBride and Ms. Mosley-Sims discussed the records request at least one time on August 4, 2016, to clarify the scope of the request (Dkt. No. 14, ¶ 10). ADHS asserts that, by the end of the day, Mr. McBride had not produced the records and left the office for the day without speaking to Ms. Mosley-Sims again (*Id.*). Mr. McBride argues that Ms. Mosley-Sims did not give much detail about pulling the records and that all she said was that she needed records pulled for two providers – SAYS and Youth Bridge – and that she needed records covering the time period of 2013 to 2016 (Dkt. No. 22, ¶ 10). Mr. McBride submits that Ms. Mosley-Sims never gave him a date or time certain that she needed the records (*Id.*).

The parties also disagree about events that occurred on Friday, August 5, 2016. ADHS asserts that Ms. Mosley-Sims began looking for Mr. McBride at the beginning of the day to advise him that she needed the records no later than noon that day (Dkt. No. 14, ¶ 11). ADHS contends that Mr. McBride's computer activity and his co-workers indicated that he was at work, but Ms. Mosley-Sims could not find Mr. McBride in the office (*Id.*). As a result, Tommy Branch, another quality assurance coordinator, looked for Mr. McBride but could not find him either (*Id.*). ADHS claims that Ms. Mosley-Sims emailed Mr. McBride and his supervisor, asking about Mr. McBride's location, but when she did not get a response, she asked Mr. Branch to pull the records (*Id.*, ¶ 12). ADHS represents that, before noon that day, Mr. McBride and Mr. Branch gave the requested records to Ms. Mosley-Sims and that Mr. McBride responded to Ms. Mosley-Sims by email, stating that he had been on the other side of the building when Ms. Mosley-Sims was looking for him (*Id.*, ¶ 13).

Mr. McBride contends that he normally arrives at work at 7:30 a.m. each morning and that when he arrived at work on Friday, August 5, 2016, he did not see Ms. Mosley-Sims because she had not yet arrived for work (Dkt. No. 22, ¶ 11). Mr. McBride asserts that, when he arrived at

work that day, he went back to pulling physically the records for SAYS and Youth Bridge, and because pulling records is a matter of routine, Mr. McBride did not feel the need to let anyone know where he was (*Id.*). Mr. McBride claims that he placed the documents in Ms. Mosley-Sims's office during the morning of August 5, 2016 (*Id.*, ¶ 13). Mr. McBride agrees that he received an email from Ms. Mosley-Sims on the morning of Friday, August 5, 2016, but contends that the email thanked him for a job well done (*Id.*, ¶ 12). He asserts that he did not receive any emails that morning other than the one from Ms. Mosley-Sims thanking him for pulling the files as requested (*Id.*).

ADHS alleges that, during the afternoon of Friday, August 5, 2016, Mr. Branch informed Ms. Mosley-Sims that he had received a call from Mr. Walsh, executive director of SAYS, and that Mr. Walsh had left a message indicating that he was trying to reach Mr. Branch (Dkt. No. 14, ¶ 14). According to ADHS, Mr. Walsh called Mr. Branch a second time that day but did not leave a message (*Id.*). Mr. McBride maintains that Mr. Branch mentioned that Mr. Walsh had called him but that Mr. Branch did not know why Mr. Walsh was calling (Dkt. No. 22, ¶ 14).

The parties agree that Mr. Branch did not return Mr. Walsh's call and that Mr. Branch instead called Mr. McBride at the direction of Mr. Thompson, asking Mr. McBride about the call from Mr. Walsh and whether he had talked to Mr. Walsh that day (*Id.*, ¶ 15). ADHS asserts that Mr. Branch said that Mr. McBride avoided and hesitated to answer the question and that Mr. McBride seemed anxious and flustered at first (Dkt. No. 14, ¶ 16). ADHS claims that, when Mr. Branch asked Mr. McBride about the call again, Mr. McBride then stated that he called Mr. Walsh to check on Mr. Walsh's wife who was in the hospital (*Id.*).

Mr. McBride denies ADHS's allegations and instead submits that Mr. Walsh stated that, during the time period of August 4 and 5, 2016, his wife was gravely ill with pneumonia (Dkt. No.

22, ¶ 16).  According to Mr. McBride, he contacted Mr. Walsh on Friday, August 5, 2016, to check on Mr. Walsh's wife (Dkt. No. 22, ¶ 7).  Mr. McBride submits that he had heard Mr. Walsh's wife was in the hospital and that he wanted to check on her (*Id.*).  He submits that Mr. Walsh received several calls from people all over the state checking on his wife (*Id.*).  Mr. McBride maintains that he did not speak with Mr. Walsh about SAYS's request for proposal or contract with ADHS because Mr. McBride did not know anything to tell Mr. Walsh about the contract (*Id.*).  Further, record evidence from Mr. Walsh in the form of deposition testimony corroborates that Mr. McBride did not speak to Mr. Walsh about the contract on August 5, 2016 (Dkt. No. 22-2, at 18).

Mr. McBride submits that Mr. Walsh stated that, after posting pictures of himself, along with his granddaughter and wife, on social media on August 5, 2016, Mr. Walsh received calls from several people, including Mr. McBride, inquiring about the condition of his wife (Dkt. No. 22, ¶ 16).  Mr. McBride points to Mr. Walsh's statement that he spoke briefly with Mr. McBride and gave a report about her condition (*Id.*).

Mr. McBride further submits that, at 11:21 a.m. on August 8, 2016, Mr. Branch sent an email to Ms. Mosley-Sims about his contact with Mr. McBride (*Id.*).  Mr. McBride reports that, in this email, Mr. Branch stated that he had received a call presumably from Mr. Walsh on August 5, 2016, but that he missed the call (*Id.*).  Mr. McBride asserts that Mr. Branch stated that he called Mr. McBride to see why Mr. Walsh would be calling Mr. Branch, and that, according to Mr. Branch, Mr. McBride stated that he had called Mr. Walsh to check on Mr. Walsh's wife, who was in the hospital (*Id.*).  Mr. McBride argues that, in the email, Mr. Branch never mentions that Mr. McBride seemed "anxious and flustered" as he is now claiming (*Id.*).  Mr. McBride alleges that, according to Mr. Walsh, Mr. Branch is an opportunist and the type of person who would take advantage of a situation (*Id.*).  Mr. McBride also claims that Mr. Branch had contacted Mr. Walsh

on July 5, 2016, leaving a text message and wanting Mr. Walsh to assist Mr. Branch in getting rid of an assistant director because Mr. Branch wanted the position (*Id.*). Mr. McBride further submits that Mary Mitchell-Davis, who worked for DYS from 1996 to 2015, and who worked under the supervision of Ms. Mosley-Sims, the assistant director at that time, stated that Mr. Branch was the type of person who would do anything to get ahead (*Id.*). ADHS contends that Ms. Mosley-Sims and Mr. Thompson directed Mr. Branch not to respond to any more calls from Mr. Walsh (Dkt. No. 14, ¶ 17). Mr. McBride denies this allegation (Dkt. No. 22, ¶ 17).

The parties disagree about the nature and extent of Mr. McBride's relationship with Mr. Walsh. ADHS asserts that Mr. McBride and Mr. Walsh knew each other for approximately 20 years and that they were professional associates as well as close friends even before Mr. McBride worked for DYS (Dkt. No. 14, ¶ 18). ADHS asserts that Mr. McBride and Mr. Walsh would talk to each other on a regular basis and that Cindi Snider, an assistant to Mr. Walsh, would hear their conversations on the speaker phone (*Id.*). Mr. McBride admits that he has known Mr. Walsh for 20 years but contends that they knew each other through Mr. McBride's work at DYS (Dkt. No. 22, ¶ 18). Mr. McBride contends that he first met Mr. Walsh while Mr. McBride worked at Alexander Youth Home (*Id.*). Mr. McBride admits that he is a friend to Mr. Walsh and his family; however, he maintains that Mr. Walsh has never gone to Mr. McBride's home and that they have only had meals together during the annual conferences held by DYS (*Id.*). Mr. McBride submits that Mr. Walsh rarely saw Mr. McBride when Mr. McBride and his team came to audit SAYS (*Id.*).

ADHS states that Mr. McBride was a coach of the AAU Arkansas Wings basketball team and that, while Mr. McBride was employed with DYS, Mr. Walsh offered to donate money to the Arkansas Wings (Dkt. No. 14, ¶ 19). ADHS contends that Mr. McBride accepted Mr. Walsh's

offer of donations and that Mr. Walsh and SAYS have made multiple donations to Mr. McBride

and the Arkansas Wings (*Id.*). Mr. McBride denies these allegations (Dkt. No. 22, ¶ 19). Instead,

he submits the following statements:

> The Arkansas Wings Basketball Program is a program that is headed by Ron Crawford. The [program] consists of several teams for the following age groups: [13, 14, 15, 16, and 17]. The Arkansas Wings has its own website[] and has a mechanism in place where people can donate through its official website.
>
> Mr. McBride volunteer[s] his time with the Arkansas Wings program in an after-school program. Mr. McBride works with one of the Arkansas Wings team[s] – [the] Arkansas Warriors [–] which is all part of the AAU [b]asketball summer program. The Arkansas AAU program stands for Arkansas Amateur Union. [Mr.] Crawford is still involved in AAU [b]asketball. Again, the Arkansas Wings has a mission of trying to reach inner city kids, trying to direct them in a positive manner, and also [hopefully] to [] get them into colleges. Some of the players who have gone through the Arkansas Wings [p]rogram have been Bobby Portis, Corliss Williamson, and Joe Johnson. These players played for the Arkansas Razorback [b]asketball [program][] and later went on to play in the National Basketball Association ("NBA"). Mr. McBride started with the AAU program about [10] years ago.
>
> In dealing with the AAU [b]asketball [p]rogram, the teams do have certain expenses. Jerry Walsh has been a supporter of the AAU [b]asketball [p]rogram. Again, the Arkansas Wings has a mechanism set up on its official website[] whereby individuals and corporations can make financial contributions. The money comes into [Mr.] Crawford, who is the [e]xecutive director of the Arkansas Wings [p]rogram, and Mr. Crawford distributes the money to the various teams. Mr. McBride was not the head coach[] but an assistant coach. Mr. McBride never see[s] the money directly, but he does see the budget, and he also sees how much goes to each team. Again, [Mr.] Crawford handles the money, and he distributes money to the teams. Mr. Crawford also pays the expenses for the teams. When the teams go on trips, Mr. Crawford takes care of the expenses.
>
> Jerry Walsh has supported AAU [b]asketball programs for the past 25 [to] 30 years. Mr. Walsh typically provide[s] financial support to teams in South Arkansas. Mr. Walsh lives in Magnolia, Arkansas. Mr. Walsh gives money to the Arkansas Boys and Girls Club[] and Southern Arkansas University ("SAU"). Mr. Walsh made a donation of $2,500.00 to [the] SAU track team. Mr. Walsh typically support[s] minority youth[] and kids from single parent homes[] who do not have the financial support to compete in AAU [b]asketball programs. Over the years, Mr. Walsh believes that he has made no more than [five] donations to the Arkansas Wings. Typically, his support is in the $100.00 range. Again, Mr. Walsh personally may have made [two] donations in the same $100.00 range. Mr. Walsh has a passion

for helping kids[] because he grew up poor. Mr. Walsh ended up going to juvenile and veteran schools while [he was] a kid. Mr. Walsh got involved in sports, and it helped him a great deal. Mr. Walsh chaired the Juvenile Advisory Board, which is an appointment by the governor.

Whenever people like Jerry Walsh make contributions to the Arkansas Wings program, Mr. McBride does not get the money. The money is given to the Arkansas Wings, and [Mr.] Crawford, as the [e]xecutive [d]irector[,] distributes the money to the various teams which are part of the Arkansas Wings organization. Mr. McBride has never gone to pick up a check from [Mr. Walsh].[2]

(*Id.*) (citations omitted). The parties agree that the donations for the basketball team are directed to the AAU director and then to the coaches (*Id.*, ¶ 20). The parties also agree that Mr. Walsh would mail a check for the donations to Mr. McBride (*Id.*).

ADHS contends that the donations to Mr. McBride and the Arkansas Wings were for the purpose of paying for uniforms, meals, hotel expenses, and other expenses, and that, as a coach, Mr. McBride personally benefited from the payment of the expenses (Dkt. No. 14, ¶ 21). Mr. McBride counters that there were never any donations made to Mr. McBride. According to Mr. McBride, when donations are made to the Arkansas Wings, that money is turned over or sent directly to the organization, and Mr. Crawford then distributes the money to the various teams (Dkt. No. 22, ¶ 21). Mr. McBride submits that, when Mr. Walsh made donations, he made the check payable to the "Arkansas Wings" (*Id.*).

ADHS also alleges that Mr. McBride would ask DYS providers for money for his basketball team (Dkt. No. 14, ¶ 22). ADHS contends that Mr. McBride told Mr. Branch that he was going to pick up a check from certain providers for his team, and that Mr. McBride would talk

---

[2] In his response to the defendant's statement of undisputed facts, Mr. McBride states that "Mr. McBride has never gone to pick up a check from Isaac [sic] McBride" (Dkt. No. 22, ¶ 19), but the Court understands and interprets the second reference to Mr. McBride as Mr. Walsh, based on Mr. McBride's citation to page 47 of his deposition testimony.

openly about going to pick up a check (*Id.*). Mr. McBride denies these allegations and maintains that he has never told anyone at DHS that he needed to go and pick up a check (Dkt. No. 22, ¶ 22).

ADHS asserts that Mr. McBride called Mr. Walsh on Thursday, August 4, 2016, or Friday, August 5, 2016, and told Mr. Walsh they were pulling SAYS records (Dkt. No. 14, ¶ 23). Mr. McBride denies that he spoke with Mr. Walsh on Thursday, August 4, 2016 (Dkt. No. 22, ¶ 23). He argues that he contacted Mr. Walsh on Friday, August 5, 2016, to check on Mr. Walsh's wife (*Id.*). Mr. McBride maintains that he had heard that Mr. Walsh's wife was in the hospital and that he wanted to check on her (*Id.*). Mr. McBride submits that Mr. Walsh received several calls from people all over the state checking on his wife and that Mr. Walsh stated that he spoke with several DYS people while his wife was in the hospital because they, like Mr. McBride, were all concerned about his wife's wellbeing (*Id.*). Mr. McBride points to Mr. Walsh's deposition testimony and states that Mr. Walsh is certain that he spoke with Mr. McBride on Friday, August 5, 2016, when Mr. McBride was simply calling to check on Mr. Walsh's wife (*Id.*).

Mr. McBride also argues that he did not speak with Mr. Walsh about the contract because Mr. McBride did not know anything to tell him about the contract (*Id.*). According to Mr. McBride, if there were any problem with contract issues, Mr. Walsh would speak to Marq Golden, who is the assistant director and leader of the contract evaluation team at DYS (*Id.*). Mr. McBride further states that SAYS submitted its contract proposal to DYS in April 2016 and that, whenever SAYS submits its contract to DYS, SAYS goes into a "blackout" period, which means that no one from the office is supposed to talk to DYS officials about the contract (*Id.*). However, Mr. McBride asserts that one of the SAYS staff members, Cindi Snider, was surreptitiously communicating to Mr. Golden about SAYS by making allegations against Mr. Walsh and others at SAYS (*Id.*). Mr. McBride also submits that Ms. Snider had mentioned to the SAYS board that

SAYS was not getting the contract, which she found out three days before the announcement was supposed to have been made (*Id.*). Mr. McBride maintains that Mr. Walsh stated in his deposition testimony that he already knew in early June 2016 based on what Ms. Snider said that SAYS was not getting the contract (*Id.*).

ADHS maintains that, if SAYS had been awarded the contract for 2016, the contract would have been for $70 million (Dkt. No. 14, ¶ 24). Mr. McBride instead asserts that the initial contract was for $35 million. However, when the contract was offered to an out-of-state firm from Indiana called Indiana Opportunities, the amount was increased to $70 million (Dkt. No. 22, ¶ 24). Mr. McBride contends that, when the contract went to the Legislative Oversight Committee, the committee was obviously upset that DHS and DYS officials had increased the contract from $35 million to $70 million, and the contract was "killed" (*Id.*). Mr. McBride states that the Legislative Oversight Committee refused to give DHS and DYS the approval for the contract, and therefore, the programs are now being operated by DYS (*Id.*).

According to ADHS, Mr. Thompson made the determination to pull immediately Mr. McBride off any monitoring assignments, and Ms. Mosley-Sims decided to place Mr. McBride on administrative leave pending a review of the matter (Dkt. No. 14, ¶¶ 25, 26). Mr. McBride argues that Ms. Mosley-Sims initiated an administrative review into the activities of Mr. McBride (Dkt. No. 22, ¶ 25). Mr. McBride submits that, according to Ms. Mosley-Sims's testimony at the Administrative Review Hearing, Mr. Thompson was out on medical leave on August 5, 2016, and that she conducted an administrative review into what was going on (*Id.*). Mr. McBride maintains that, after Ms. Mosley-Sims told Mr. Thompson what was going on, she directed Mr. Thompson to take Mr. McBride off any pending assignments, and Ms. Mosley-Sims then placed Mr. McBride

on administrative leave on Monday, August 8, 2016 (*Id.*). Mr. McBride admits that Ms. Mosley-Sims decided to place him on administrative leave pending a review of the matter (*Id.*, ¶ 26).

The parties agree that, at a meeting on Monday, August 8, 2016, Mr. Thompson and Ms. Mosley-Sims informed Mr. McBride about the administrative review (Dkt. No. 22, ¶ 27). Ms. Mosley-Sims specifically instructed Mr. McBride not to discuss the administrative review with anyone within or outside ADHS (*Id.*). In addition, he was told not to discuss any work-related matter with any person unless requested to do so by his supervisors (*Id.*).

ADHS asserts that Mr. Branch later received a phone call from an Arkansas state representative inquiring about the investigation of Mr. McBride and about his job situation (Dkt. No. 14, ¶ 28). Mr. McBride denies this allegation and instead submits that Fred Allen, a state representative whom Mr. McBride knows, would ask Mr. McBride in times past how things were going over at DYS (Dkt. No. 22, ¶ 28). Mr. McBride submits that these would just be casual conversations (*Id.*).

ADHS claims that, on August 8, 2016, Mr. McBride called Mr. Walsh to tell him that he had been placed on administrative leave or terminated but that Mr. McBride was unable to reach Mr. Walsh (Dkt. No. 14, ¶ 29). Mr. McBride points to Mr. Walsh's deposition testimony that Mr. Walsh had heard that Mr. McBride had been placed on administrative leave but was not sure where he had heard it from (Dkt. No. 22, ¶ 29). Mr. McBride submits that Mr. Walsh stated that he may have called Mr. McBride but was not sure (*Id.*).

Citing Ms. Snider's declaration, ADHS contends that Mr. McBride called Ms. Snider on her cell phone on August 8, 2016, and said to Ms. Snider, "Where is Jerry, I need to talk to him immediately. Could you call him and tell him to call me. I'm getting fired for talking to Jerry about the contract" (Dkt. No. 14, ¶ 30). ADHS submits that Mr. McBride had already tried Mr.

Walsh's cell phone but could not reach him (*Id.*). ADHS asserts that Ms. Snider then called Mr. Walsh and told him that Mr. McBride was trying to get in touch with him and that he needed to call Mr. McBride (*Id.*, ¶ 31). ADHS submits that Mr. Walsh called Ms. Snider back directly and said that he talked to Mr. McBride and that DYS was blaming Mr. McBride for letting him know that he was not getting the contract (*Id.*). According to ADHS, Mr. Walsh was "astounded" when he heard about Mr. McBride's job situation (*Id.*). Mr. McBride denies ADHS's allegations regarding Mr. McBride's conversation with Ms. Snider and regarding Ms. Snider's subsequent conversation with Mr. Walsh (Dkt. No. 22, ¶¶ 30, 31). Instead, Mr. McBride submits that when he was unable to reach Mr. Walsh on Friday, August 5, 2016, to check on Mr. Walsh's wife, he then contacted Ms. Snider, who was at home on medical leave, asked her where Mr. Walsh was, and asked her to let Mr. Walsh know that Mr. McBride was trying to get in contact with him (*Id.*, ¶ 30). Mr. McBride then cites Mr. Walsh's deposition testimony that Mr. Walsh stated he received a call from Ms. Snider on August 5, 2016, who was also checking on his wife, along with several other people, including Mr. McBride (*Id.*, ¶ 31). Mr. McBride points to Mr. Walsh's testimony that he has never spoken with Mr. McBride about the contract because Mr. McBride did not know anything (*Id.*).

ADHS submits that Mr. Golden indicated that further developments had occurred that morning as a complaint had been received, alleging that someone at DYS had informed Mr. Walsh that SAYS would not be awarded certain facility contracts that were at that time undergoing procurement (Dkt. No. 14, ¶ 32). Mr. McBride contends that Ms. Snider had been communicating with Mr. Golden about SAYS and making all kinds of allegations against Mr. Walsh and SAYS, although, at the time, Ms. Snider was out on medical leave from SAYS and was not at work (Dkt. No. 22, ¶ 32). Mr. McBride argues that Ms. Snider was not supposed to be communicating with

DYS about the contract due to SAYS's "blackout" policy but alleges that Ms. Snider advised the board president that SAYS would not be getting the contract even before that announcement was made (*Id.*). Mr. McBride cites Mr. Walsh's deposition testimony that he was perplexed as to how Ms. Snider could possibly know this when the official announcement had not been made (*Id.*). Mr. McBride contends that Ms. Snider stated she had gotten the information from Mr. Golden, and Mr. McBride contends that, when Mr. Walsh pulled Ms. Snider's cell phone records, Mr. Walsh discovered that she and Mr. Golden had over 100 calls between them (*Id.*).

The parties agree that, on Tuesday, August 9, 2016, Ms. Mosley-Sims raised the potential breach of information by Mr. McBride with executive staff at DYS, including the director, Betty Guhman, and the assistant director for Residential Services, Marq Golden (Dkt. No. 22, ¶ 33). Because the information was strictly confidential, the alleged breach was a serious matter (*Id.*, ¶ 34). On Wednesday, August 10, 2016, Ms. Mosley-Sims asked the DHS Office of Internal Affairs/Fraud Investigations ("OIA") to conduct a factual investigation of the matter because of its sensitivity (*Id.*, ¶ 35). The OIA investigator, Ashley Griesemer, conducted an investigation, interviewing individuals with direct knowledge of relevant incidents in the case, including Mr. McBride, Mr. Branch, Mr. Golden, Mr. Thompson, and the complainant from SAYS who asked to remain confidential (*Id.*, ¶ 36).

ADHS contends that, on review of the investigative report, it was clear to Ms. Mosley-Sims that Mr. McBride did, in fact, speak to SAYS director Mr. Walsh sometime on August 4 or August 5, 2016, and inform him that records regarding his organization were being pulled (Dkt. No. 14, ¶ 37). ADHS argues that Mr. McBride inappropriately shared information that he was only privy to by virtue of his position at DYS and that this inappropriate sharing of information created an appearance of ethical violation and impropriety (*Id.*, ¶ 38). Mr. McBride counters that

he did not speak with Mr. Walsh on Thursday, August 4, 2016, and that he contacted Mr. Walsh on Friday, August 5, 2016, to check on his wife because he had heard that Mr. Walsh's wife was in the hospital (Dkt. No. 22, ¶ 38). Mr. McBride states that Mr. Walsh is certain that he spoke with Mr. McBride on Friday, August 5, 2016, and that he called to check on Mr. Walsh's wife (*Id.*). Mr. McBride points out that Mr. Walsh received several calls from people all over the state checking on his wife, including several DYS people, because they, like Mr. McBride, were concerned about his wife's wellbeing (*Id.*). Mr. McBride asserts that, throughout the investigation, he denied talking to Mr. Walsh about the contract of which Mr. McBride had no knowledge, and he denied that he told Mr. Walsh that he was asked to pull records on SAYS (*Id.*, ¶ 37). Mr. McBride also submits that Ms. Griesemer never spoke with Mr. Walsh during her investigation (*Id.*, ¶ 37).

Mr. McBride further asserts that, if there were any problem with contract issues, Mr. Walsh would speak to Mr. Golden, who is the assistant director of DYS and the leader of DYS's contract evaluation team (*Id.*, ¶ 38). Mr. McBride submits that SAYS submitted its contract proposal to DYS in April 2016 and that, whenever SAYS submits its contract to DYS, the organization goes into a "blackout" period during which no one from the office is supposed to speak with DYS officials about the contract (*Id.*). However, Mr. McBride asserts that Ms. Snider, a staff member of SAYS, was surreptitiously communicating with Mr. Golden about SAYS and making allegations against Mr. Walsh and others at SAYS (*Id.*). According to Mr. McBride, Ms. Snider had also mentioned to the SAYS board that SAYS was not getting the contract, which she found out three days before the announcement was supposed to have been made (*Id.*). Mr. McBride contends that Mr. Walsh stated he already knew in early June 2016 that SAYS was not getting the contract, based on what Ms. Snider said (*Id.*).

ADHS argues that the evidence from multiple sources shows that this conduct is part of a larger pattern of behavior in which Mr. McBride fraternizes with Mr. Walsh and perhaps other providers, entities he is responsible for monitoring for contractual compliance, and requests donations from them to support his basketball team (Dkt. No. 14, ¶ 39). In response, Mr. McBride denies these allegations and explains his relationship to the Arkansas Wings Basketball Program and Mr. Walsh (Dkt. No. 22, ¶ 39) (citations omitted).

ADHS contends that the investigator asked Mr. McBride to provide his cell phone records to support his contention that he did not call Mr. Walsh on those dates, and Mr. McBride agreed to do so but later that day called to refuse to provide the records (Dkt. No. 14, ¶ 40). ADHS submits that Mr. McBride was found to be not credible in his denial of having called or in the reason he initially claimed to have called (*Id.*). Mr. McBride contends that, initially, Ms. Griesemer requested that Mr. McBride provide his cell phone records for the two days in question, which he agreed to do (Dkt. No. 22, ¶ 40). However, Mr. McBride asserts that the investigator then asked him to provide his cell phone records for an extended period of time, which Mr. McBride did not feel comfortable doing (*Id.*). Mr. McBride maintains that the investigator in the case was unable to determine whether Mr. McBride did in fact have a phone conversation with Mr. Walsh and, furthermore, that it was not her job to make conclusions about the credibility of witnesses (*Id.*).

The parties agree that, on August 8, 2016, Mr. McBride was informed of the administrative review and placed on leave (Dkt. No. 22, ¶ 41). He was directed at that time not to discuss the investigation or any work-related matter with any outside person (*Id.*). However, ADHS contends that Mr. McBride deliberately ignored and failed to comply with directives from his supervisors with respect to responding to requests for information or Freedom of Information Act ("FOIA")

requests, discussing or sharing information regarding the residential contract procurement, and discussing the administrative review and work-related matters while on administrative leave (Dkt. No. 14, ¶ 42). Mr. McBride denies this allegation and instead submits that Fred Allen, a state representative who Mr. McBride knows, would ask Mr. McBride in times past how things were going over at DYS (Dkt. No. 22, ¶ 42). Mr. McBride submits that these would just be casual conversations (*Id.*). Mr. McBride points to Mr. Walsh's deposition testimony that Mr. Walsh had heard that Mr. McBride had been placed on administrative leave but was not sure where he had heard it from (*Id.*). Mr. McBride submits that Mr. Walsh stated that he may have called Mr. McBride but was not sure (*Id.*).

The parties agree that Lynne Bowen was the DYS grievance officer who conducted the grievance hearing for Mr. McBride's involuntary termination (Dkt. No. 22, ¶ 43). ADHS submits that Ms. Bowen found that Mr. McBride violated DHS Policy 1081(I) – Ethical Standards for DHS Employees, Employee Conduct – when he made an unsolicited call to Mr. Walsh during the timeframe when SAYS records were being pulled and when he used his position to accept donations from Mr. Walsh for his AAU basketball team that resulted in the appearance of impropriety (Dkt. No. 14, ¶ 44).

Mr. McBride counters with the following statements:

Mr. McBride had a grievance hearing that was conducted on November 16, 2016. Lynn Bowen, as a DHS [e]mployee, was assigned by the [d]irector of DHS to serve as the hearing officer. Several witnesses testified at this hearing, including Mr. McBride and Jerry Walsh. Mr. McBride was represented by undersigned counsel, and DHS was represented by counsel. Although the grievance rules of DHS provide that a written recommendation by the hearing officer [shall] be made within [three] business days after the hearing, Ms. Bowen issued a recommendation on November 29, 2016, which was [seven] days after the hearing. DHS Policy No. 1086(IV)(o)[] also states that the hearing officer shall submit the written recommendation to the grievance officer, [which] in this case is Antionette Mitchell. The policy also provides that once the hearing officer receives the written recommendation, it will be "promptly submitted to the DHS [d]irector and the

17

parties." The policy further provides that "[t]he DHS [d]irector shall review the recommendation and issue a final decision within [five] business days."

Mr. McBride was in constant contact with Antionette Mitchell trying to determine the status of his grievance hearing. On February 27, 2017, Mr. McBride emailed Ms. Mitchell trying to determine the status of his grievance. Ms. Mitchell emailed back saying that the matter [was] still pending in the [d]irector's office. On April 7, 2017, Mr. McBride again email[ed] Ms. Mitchell trying to find out about his grievance case. Ms. Mitchell again state[d] that the matter [was] still in the [d]irector's office. Finally, on May 22, 2017, Mr. McBride asked Ms. Mitchell does it normally take this long for a decision to be made. Ms Mitchell replie[d] that she cannot give an opinion about the timeframe, but as soon as she gets the director's decision, she [would] let him know.

DHS Policy No. 1086 further provides that should the employee not be satisfied with the director's decision, in this case there was none, the employee can next ask for an appeal hearing before the State Employee Grievance Appeal Panel ("SEGAP"). There are [three] state employees from outside DHS who make up the State Employee Grievance Appeal Panel. Again, the grievance hearing officer made a recommendation on November 29, 2016, and that recommendation was forwarded to the director's office on November 30, 2016, where the case has lingered even until this day.

(Dkt. No. 22, ¶ 44) (footnotes and citations omitted).

ADHS also contends that Mr. McBride violated DHS Policy 1084.3 – Integrity and Honesty – a violation of which alone would warrant termination (Dkt. No. 14, ¶ 45). ADHS argues that Mr. McBride committed two misstatements of fact during the OIA investigation. The first was when he was asked if he knew of any phone calls made to Mr. Walsh on or about August 4, 2016, or August 5, 2016, and he replied, "No," and then later in the interview and in his testimony under oath at the hearing, he admitted to calling Mr. Walsh to check on his wife (*Id.*). The second was when Mr. McBride was asked in his interview whether Mr. Walsh had ever donated money to Mr. McBride's basketball team and he replied, "Not that I recall," and then Mr. Walsh testified at the grievance hearing that he did donate to the AAU basketball team (*Id.*, ¶ 46).

Regarding ADHS's first allegation of misstatement of fact, Mr. McBride counters with the following statements:

> Mr. McBride had a grievance hearing that was conducted on November 16, 2016. Lynn Bowen, as a DHS [e]employee, was assigned by the [d]irector of DHS to serve as the hearing officer. Several witnesses testified at this hearing, including Mr. McBride and Jerry Walsh. Mr. McBride was represented by undersigned counsel, and DHS was represented by counsel. Although the grievance rules of DHS provide that a written recommendation by the hearing officer [shall] be made within [three] business days after the hearing, Ms. Bowen issued a recommendation on November 29, 2016, which was [seven] days after the hearing.

(Dkt. No. 22, ¶ 45). Regarding the second allegation of misstatement of fact, Mr. McBride again counters with a statement explaining his relationship to the Arkansas Wings Basketball Program and Mr. Walsh (Dkt. No. 22, ¶ 46) (citations omitted).

ADHS also contends that Mr. McBride violated DHS Policy 1084.3.2 when Mr. Golden, an assistant director for residential services, received a call from Ms. Snider stating that somebody at DYS had informed Mr. Walsh that SAYS would not be awarded a contract (Dkt. No. 14, ¶ 47). In denying this allegation, Mr. McBride submits that Ms. Snider had been communicating with Mr. Golden about SAYS and making all kinds of allegations against Mr. Walsh and SAYS, although, at the time, Ms. Snider was out on medical leave from SAYS and was not at work (Dkt. No. 22, ¶ 47). Mr. McBride argues that Ms. Snider was not supposed to be communicating with DYS about the contract due to SAYS's "blackout" policy, but he contends that Ms. Snider advised the board president that SAYS would not be getting the contract (*Id.*). Mr. McBride cites Mr. Walsh's deposition testimony that he was perplexed as to how Ms. Snider could possibly know this when the official announcement had not been made (*Id.*). Mr. McBride contends that Ms. Snider stated that she had gotten the information from Mr. Golden and that, when Mr. Walsh pulled Ms. Snider's cell phone records, he discovered that she and Mr. Golden had over 100 calls between them (*Id.*).

The parties agree that Jocelyn Potter is employed in DYS Human Resources and that Ms. Potter researched and provided information concerning certain DYS employees who are alleged

to be comparators (Dkt. No. 22, ¶ 48).  However, Mr. McBride disagrees with the information she provided regarding certain current and former employees of DYS.  ADHS submits Ms. Potter's information and contends that Michael Poole is a former DYS employee who worked in the IT division as a computer support technician (Dkt. No. 14, ¶ 49).  His job responsibilities included installing software, printers, scanners, troubleshooting reported errors, and assisting employees with any issues with desktop printers (*Id.*).  His supervisor was Barry Rowland (*Id.*).  ADHS contends that Mr. Poole did not drive a state vehicle while intoxicated and that Mr. Rowland would have known about that (*Id.*).

Mr. McBride submits that Mr. Poole was a Caucasian employee of DYS who travelled to Colt, Arkansas, in a state vehicle (Dkt. No. 22, ¶ 49).  According to Mr. McBride, Ms. Robinson was the director of the program in Colt, Arkansas, and she contacted the Central Office to complain about Mr. Poole having alcohol on his breath while visiting their center (*Id.*).  Mr. McBride points to Mary Mitchell-Davis's deposition testimony that Ms. Robinson said the kids at the center commented on Mr. Poole smelling of alcohol, stating, "How are ya'll [sic] going to tell us about it, when you got employees who are drunk?" (*Id.*).  Mr. McBride submits that, once Ms. Robinson called to complain about Mr. Poole's apparent intoxication, DYS prohibited Mr. Poole from driving a state vehicle, and employee David Land was assigned to drive Mr. Poole around to the various locations he had to go to provide service (*Id.*).  Mr. McBride asserts that the fact that Mr. Poole was not disciplined led Ms. Mitchell-Davis, an African-American female, to complain about the culture of discrimination she had observed at DYS while employed there (*Id.*).

With respect to Adam Baldwin, both parties agree that he is a current DYS employee who worked in the system reform division as a system reform manager (Dkt. No. 22, ¶ 50).  The system reform division was created to advance the cause of juvenile justice in the state by:  (1) providing

trainings for providers and all people in the juvenile justice system in Arkansas; (2) unifying juvenile justice practices across the state; and (3) developing relationships with national entities and bringing them into the state (*Id.*). Mr. Baldwin received counseling for abuse of time allegations (*Id.*). His supervisor during the pertinent time was Steve Nawoczyk (*Id.*).

While Mr. McBride admits those facts, he adds that Mr. Baldwin is a white employee who had severe attendance issues and had a reputation of rarely coming to work (*Id.*). Mr. McBride adds that Mr. Baldwin worked under the supervision of Mr. Nawoczyk, who is also a white employee. Mr. McBride contends that both Mr. Nawoczyk and Mr. Baldwin were falsifying their time records by stating that they were going to various facilities for the purpose of providing training when in fact they were not (*Id.*). Mr. McBride submits that, when Ms. Mitchell-Davis and her team would go to these facilities, they did not see Mr. Nawoczyk or Mr. Baldwin's names on the required sign-in sheets, and when they asked the people at the facilities whether they had been there, they were told they had not (*Id.*). Mr. McBride argues that Mr. Nawoczyk and Mr. Baldwin were therefore falsifying their time records because they prepared records indicating that training had been provided when in fact no training had been provided (*Id.*).

With respect to Mr. Nawoczyk, ADHS contends that he is a former employee who worked in the system reform division as a system control manager and that his supervisor was Ms. Mosley-Sims (Dkt. No. 14, ¶ 51). ADHS asserts that he was not abusing his time while Ms. Mosley-Sims was supervising him and that Ms. Mosley-Sims always knew where he and his staff were and what they were doing (*Id.*). ADHS contends that Mr. Nawoczyk and his staff were out of the office often because they were doing training and workshops (*Id.*). In response, Mr. McBride submits Ms. Mitchell-Davis's deposition testimony that both Mr. Nawoczyk and Mr. Baldwin were falsifying their time records by stating that they were going to various facilities for the purpose of

providing training when in fact they were not (Dkt. No. 22, ¶ 51). Mr. McBride contends that there were times when Ms. Mosley-Sims did not know where Mr. Baldwin was, and she would call for him because he would not be at his desk (*Id.*). Mr. McBride alleges that Mr. Baldwin lived right down the street from the Central Office, which is in downtown Little Rock, and when Ms. Mosley-Sims would call Mr. Baldwin on his cell phone trying to determine his whereabouts, Mr. Baldwin would come "running down the street" to the office (*Id.*). Further, there is deposition testimony in the record from Ms. Mitchell-Davis that suggests Ms. Mosely-Sims was aware of this alleged conduct on the part of Mr. Nawoczyk and Mr. Baldwin (Dkt. No. 22-4, at 16-17).

The parties agree that Debbie Garland is a former DYS employee who worked in the education division as a records management analyst (Dkt. No. 22, ¶ 52). The education division is responsible for educating adjudicated youth during time of incarceration (*Id.*). Her supervisors were James Walker and Michael O'Leary (*Id.*). She was terminated for gross misconduct, which included bringing a gun to the workplace, discourteous treatment of others, and unprofessional behavior *via* email (*Id.*).

Michael O'Leary is a former DYS employee who worked in the education division as an assistant superintendent (Dkt. No. 22, ¶ 53). His supervisor was Brett Smith (*Id.*). ADHS contends through Ms. Potter that it is not aware of any misconduct necessitating discipline (Dkt. No. 14, ¶ 53). Mr. McBride disagrees and alleges that Mr. O'Leary and Mr. Smith, both Caucasian male employees, purchased a computer program at a cost of approximately $80,000.00 without proper authorization (Dkt. No. 22, ¶ 53).

With respect to Mr. Smith, both parties agree that he is a current DYS employee who works in the education division as a superintendent (*Id.*, ¶ 54). During the relevant time period, Marcella

Dalla Rosa was his supervisor, and prior to her, his supervisor was James Washington (*Id.*).  Mr. Smith was disciplined by being demoted for the unauthorized purchase of a vo-tech program (*Id.*).

Mr. McBride is not aware of any DHS employees who ever made a racially derogatory comment to him (*Id.*, ¶ 55).  Mr. McBride has not seen anybody write an email or any racially derogatory comment directed to him (*Id.*, ¶ 56).  He does not remember hearing any racially derogatory comment directed towards any other employee (*Id.*, ¶ 57).

ADHS contends that Mr. McBride has never heard any DHS employee use the "N" word and that he has never heard that any DYS Caucasian employees are harder working than African-American employees (Dkt. No. 14, ¶¶ 58, 59).  Mr. McBride alleges that he has heard the "N" word used because they work in cubicles, but the word was not directed to him (Dkt. No. 22, ¶¶ 58, 59).  Mr. McBride adds that he has seen white employees get rewarded by getting promotions for doing the same work that black employees do (*Id.*).

Finally, ADHS asserts that Mr. McBride and Mr. Walsh talked about Mr. McBride's lawsuit approximately one month before Mr. Walsh's deposition, which was after Mr. McBride's deposition (Dkt. No. 14, ¶ 60).  ADHS asserts that the conversation was about the contract and that Mr. Walsh knew early on that he was not going to get the contract (*Id.*).  Mr. McBride claims that, although he saw Mr. Walsh about a month before Mr. Walsh's deposition and Mr. Walsh attempted to talk about the case, Mr. McBride did not do much talking at all; Mr. Walsh did most of the talking (Dkt. No. 22, ¶ 60).  Mr. McBride asserts that Mr. Walsh mentioned to him that Mr. Walsh knew early on that they were not going to get the contract based on what Ms. Snider had informed the board and that he and Mr. Walsh ended up talking about basketball as they often do (*Id.*).

## II.     Standard Of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). Accordingly, this Court applies the same summary judgment standard to discrimination cases as it does to all others.

### III. Discussion

#### A. 42 U.S.C. § 1983 Claim

In his complaint, Mr. McBride brings a claim of race discrimination in violation of 42 U.S.C. § 1983 and seeks damages as well as equitable and injunctive relief. The Court notes that the Court of Appeals for the Eighth Circuit holds, in the employment discrimination context, that the elements of Title VII claims and § 1983 claims are the same. *See, e.g., Humphries v. Pulaski County Special Sch. Dist.*, 580 F.3d 688, 692 n.3 (8th Cir. 2009) (addressing Title VII, § 1983, and § 1981 claims together and applying same standards). The Court also notes that a Title VII claim of discrimination and a constitutional equal protection claim pursuant to § 1983 may both be asserted when the plaintiff alleges that separate rights – statutory on the one hand and constitutional on the other – have been violated. *Mercer v. City of Cedar Rapids, Iowa*, 79 F. Supp. 2d 1055, 1062 (N.D. Iowa 1999). ADHS does not specifically address Mr. McBride's claim of disparate treatment in violation of § 1983 in its brief in support of motion for summary judgment (Dkt. No. 15). In his brief in opposition to ADHS's motion for summary judgment, Mr. McBride includes a section in regard to his § 1983 claim but seems to make a scrivener's error when addressing facts not at issue or even mentioned elsewhere in the record currently before this Court (Dkt. No. 23, at 16).

Even assuming Mr. McBride alleges relevant facts in support of his § 1983 claim, the Eleventh Amendment protects states and state agencies from suit by private citizens. *Doe v. Nebraska*, F.3d 593, 597 (8th Cir. 2004). *See also Pediatric Specialty Care, Inc. v. Arkansas Dep't of Human Services,* 443 F.3d 1005 (8th Cir. 2006) (overruled on other grounds) (holding the Arkansas Department of Human Services was entitled to Eleventh Amendment immunity and dismissing all claims against the agency). Mr. McBride brings his claims for monetary damages

and injunctive relief only against ADHS the agency and not against any individuals who work at ADHS in their official capacity. Therefore, the Court dismisses with prejudice Mr. McBride's § 1983 claim against ADHS.

## B. Title VII Claim

Mr. McBride also brings a claim of race discrimination in violation of Title VII. Specifically, Mr. McBride, who is African American, asserts that he was afforded less favorable terms and conditions of employment as compared to similarly situated persons outside of his protected group when he was terminated for allegedly mishandling sensitive information (Dkt. No. 1, ¶ 41). ADHS does not raise a defense of sovereign immunity, and the Eighth Circuit Court of Appeals has "consistently held that Congress validly abrogated the Eleventh Amendment with the enactment of Title VII." *Warren v. Prejean*, 301 F.3d 893, 899 (8th Cir. 2002).

Mr. McBride can establish a *prima facie* case of discrimination either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination under the three-step analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 953 (8th Cir. 2012). Direct evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Torgerson*, 643 F.3d at 1043-44 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). Therefore, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. *Id.* A plaintiff with strong direct evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell-Douglas* analysis to get to the jury, irrespective of whether his strong evidence is circumstantial. *Id.* However, "if the plaintiff lacks evidence that clearly points to the presence of

an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell-Douglas* analysis, including sufficient evidence of pretext." *Id.* (quoting *Griffith*, 387 F.3d at 736).

### 1.     **Direct Evidence Analysis**

"To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998) (internal quotation marks omitted). Mr. McBride presents no direct evidence of discrimination in support of any of his claims. Accordingly, the Court will proceed through the *McDonnell-Douglas* analysis.

### 2.     ***McDonnell-Douglas* Analysis**

Under the *McDonnell-Douglas* analysis, "the plaintiff bears the burden of establishing a *prima facie* case of discrimination." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007). If a plaintiff makes out a *prima facie* case, he creates a presumption of unlawful discrimination, and the burden shifts to the defendant to come forward with evidence of a legitimate nondiscriminatory reason for its actions. *Id.* If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual and that unlawful discrimination was the true reason for the adverse employment action. *Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 990 (8th Cir. 2011). Pretext may be demonstrated by different means. *See, e.g., Roxas v. Presentation College*, 90 F.3d 310, 316 (8th Cir. 1996).

Mr. McBride alleges race discrimination based on ADHS's termination of him. To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that: (1) he is

a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 716 (8th Cir. 2012). Mr. McBride has shown the first and the third factors, as he is a member of a protected class and suffered an adverse employment action. The Court examines the second and fourth factors below.

ADHS argues that Mr. McBride was not meeting the legitimate job expectations of ADHS (Dkt. No. 15). According to ADHS, Mr. McBride was terminated from DYS because he violated DHS Policies 1081(I), 1084.3.1, and 1084.3.2 (Dkt. No. 15, at 10). ADHS alleges that Mr. McBride did not meet the legitimate expectations of DHS because he was soliciting and accepting donations from a provider from which he benefited and sharing confidential DYS information with the provider (*Id.*). ADHS further alleges that Mr. McBride did not avoid any potential conflict of interest nor did he avoid an appearance of impropriety (*Id.*). According to ADHS, Mr. McBride did not meet the legitimate expectations of DHS when he did not conduct himself so as to foster public confidence in the integrity of state government (*Id.*).

The Court finds that Mr. McBride has presented sufficient evidence to survive summary judgment on the second element of his *prima facie* case. As to ADHS's claim that Mr. McBride was soliciting and accepting donations from a provider from which he benefited, Mr. McBride submits that Mr. Walsh has been a supporter of the AAU basketball program for 25 to 30 years and that donations go to Mr. Crawford, the executive director of the Arkansas Wings program, who then distributes the money to the various teams (Dkt. No. 23, at 6-7). Mr. McBride argues that Mr. Walsh has a passion for helping kids because he grew up poor and sports helped him a great deal (*Id.*, at 8). According to Mr. McBride, whenever people like Mr. Walsh make

contributions to the Arkansas Wings program, Mr. McBride does not get the money (*Id.*). In response to ADHS's claim that he shared confidential DYS information with the provider, Mr. McBride and Mr. Walsh testified that Mr. McBride only spoke with Mr. Walsh on August 5, 2016, to check on Mr. Walsh's wife (*Id.*, at 8-9). The record, when viewed in a light most favorable to Mr. McBride, does not entitle ADHS to summary judgment on this element.

"[A] plaintiff can satisfy the fourth part of the *prima facie* case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." *Pye v. Nu Aire, Inc.,* 641 F.3d 1011, 1019 (8th Cir. 2011) (citing *Lewis v. Heartland Inns of Am., L.L.C.,* 591 F.3d 1033, 1039–40 (8th Cir. 2010)). The Eighth Circuit has set a "'low threshold' for employees to be considered similarly situated" at the *prima facie* stage, "requiring only that the employees 'are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Orr v. City of Rogers*, 232 F. Supp. 3d 1052, 1063 (W.D. Ark. 2017) (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005)). Mr. McBride asserts that four Caucasian employees with similar infractions at work were treated differently than he was treated.

The Court has reviewed the record evidence relating to potential comparators Adam Baldwin, Brett Smith, Michael Poole, and Perry (last name unknown), all of whom are Caucasian, in the light most favorable to Mr. McBride. The Court finds that Mr. McBride has presented sufficient evidence to meet the fourth element in his *prima facie* case as a matter of law.

Because Mr. McBride has made a *prima facie* case, the burden shifts to defendant ADHS to show that it had a legitimate, nondiscriminatory reason for firing him. "This burden is not onerous." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012). Courts do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made

by employers, except to the extent that those judgments involve intentional discrimination." *Id.* at 955 (quotation omitted). Defendants need only proffer a good-faith reason for their action. *Id.*

ADHS submits that Mr. McBride was terminated from DYS because he violated DHS Policies 1081(I), 1084.3.1, and 1084.3.2 (Dkt. No. 15, at 10). ADHS contends that Mr. McBride violated DHS Policy 1081(I) – Ethical Standards for DHS Employees, Employee Conduct – when he made an unsolicited call to Mr. Walsh during the timeframe when SAYS records were being pulled and when he used his position to accept donations from Mr. Walsh for his AAU basketball team that resulted in the appearance of impropriety (Dkt. No. 14, ¶ 44). ADHS also contends that Mr. McBride violated DHS Policy 1084.3 – Integrity and Honesty – a violation of which alone would warrant termination, when Mr. McBride committed two misstatements of fact during the OIA investigation (Dkt. No. 14, ¶ 45-46). Finally, ADHS submits that Mr. McBride violated DHS Policy 1084.3.2 when Mr. Golden, an assistant director for residential services, received a call from Ms. Snider stating that somebody at DYS had informed Mr. Walsh that SAYS would not be awarded a contract (Dkt. No. 14, ¶ 47). These alleged violations of ADHS policy constitute evidence of a legitimate, nondiscriminatory basis for Mr. McBride's termination. *See Putnam v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) ("Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.").

Because ADHS has carried its burden of articulating legitimate, nondiscriminatory reasons to terminate Mr. McBride, "the presumption of discrimination disappears," and the burden returns to Mr. McBride "to prove that the proffered justification is merely a pretext for discrimination." *Putnam v. Unity Health Sys.,* 348 F.3d 732, 736 (8th Cir. 2003). "There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext." *Togerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc). First, "[a] plaintiff may show that the

employer's explanation is unworthy of credence because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer." *Id.* In this sense, Mr. McBride's burden of establishing pretext "merges with the ultimate burden of persuading the court that [he was] the victim of intentional discrimination." *Id.* at 1046. As the Eighth Circuit Court of Appeals has explained, "[p]roof of pretext, coupled with a strong *prima facie* case, may suffice to create a triable question of fact." *Id.*

The Court determines that, considering the record evidence as a whole and construing all reasonable inferences from the record evidence in the light most favorable to Mr. McBride, there are genuine issues of material fact in dispute at the pretext stage that preclude this Court from granting summary judgment in favor of ADHS.

Pretext may be established by demonstrating that an employer failed to follow its own policies. *See, e.g., Ledbetter v. Alltel Corporate Services, Inc.*, 437 F.3d 717, 722 (8th Cir. 2006). Here, Mr. McBride argues that, although the DHS grievance rules provide that a written recommendation by the hearing officer shall be made within three business days after the hearing, the hearing officer, Lynn Bowen, did not issue a recommendation until seven days after the hearing (Dkt. No. 22, ¶ 44). He further argues that, although DHS Policy 1086(IV)(o) states that the hearing officer shall submit the written recommendation to the grievance officer and that the DHS director shall review the recommendation and issue a final decision within five days, he had still not received the director's decision as of the date Mr. McBride filed his response to ADHS's statement of undisputed facts (*Id.*). There is no record evidence from ADHS, or even argument offered, responding to these allegations as to why it appears ADHS policy was not followed in regard to Mr. McBride.

Further, the Court concludes that there are material questions of fact in dispute regarding the reasons articulated by ADHS that Mr. McBride was terminated from DHS, calling into question whether ADHS's explanation is unworthy of credence because it may have no basis in fact. For example, ADHS argues that Mr. McBride violated DHS Policy 1084.3.1 when he misrepresented that he would provide his phone records to the investigator (*Id.*). Viewing the record in the light most favorable to Mr. McBride, the Court determines that a reasonable juror could conclude that Mr. McBride simply changed his mind as to whether he would provide his phone records after ADHS expanded the request to days beyond August 4, 2016, and August 5, 2016.

ADHS also submits that Mr. McBride violated DHS Policy 1084.3.2 when Mr. Golden, an assistant director for residential services, received a call from Ms. Snider stating that somebody at DYS had informed Mr. Walsh that SAYS would not be awarded a contract (Dkt. No. 14, ¶ 47). Mr. McBride argues in response that Ms. Snider and Mr. Golden had over 100 calls between them even though Ms. Snider was not supposed to be communicating with DYS about the contract due to SAYS's "blackout policy" (Dkt. No. 22, ¶ 47). Mr. McBride submits that Ms. Snider advised the SAYS board president that SAYS would not be getting the contract, and that Mr. Walsh was perplexed as to how Ms. Snider could possibly know this when the official announcement had not been made (*Id.*). The Court determines that, viewing the record in the light most favorable to Mr. McBride, as the Court is required to do at the summary judgment stage, a genuine issue of material fact exists as to whether Mr. McBride is the DYS employee who informed Mr. Walsh that SAYS would not be awarded a contract based on the frequent communication between Ms. Snider and Mr. Golden.

The Court now turns to Mr. McBride's attempts to establish pretext through the use of purported comparators. Pretext may be demonstrated by showing that an employer treated similarly-situated employees in a disparate manner. *Lake v. Yellow Transportation, Inc.,* 596 F.3d 871, 874-75 (8th Cir. 2010). The Court acknowledges that the standard in the Eighth Circuit to determine whether employees are similarly situated at the pretext stage "is a search for a substantially similar employee, not for a clone." *Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1231 (8th Cir. 2013) (quotations omitted). "To demonstrate that they are 'similarly situated,' he need only establish that [ ] he was treated differently than other employees whose violations were of *comparable seriousness*." *Id.* (emphasis in original) (quotations omitted).

Even so, "[a]t the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.'" *Bone,* 686 F.3d at 956 (quoting *Rodgers,* 417 F.3d at 853). To succeed at this stage of the proceedings, Mr. McBride must show that he and the potential comparators he identifies were "similarly situated in all relevant respects." *Id.* (quoting *Rodgers*, 417 F.3d at 853). Thus, "[w]hat is relevant is [whether they] are involved in or accused of the same offense and are disciplined in different ways." *Id.* (quoting *Boner v. Bd. of Comm'rs*, 674 F.2d 693, 697 (8th Cir. 1982)). The employees used for comparison "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004)), *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 606 (8th Cir. 1983); *see also Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."). "In determining whether a plaintiff has met his burden with respect to pretext in a summary judgment

motion, a district court is prohibited from making a credibility determination or a factual finding from conflicting evidence." *Yates v. Rexton, Inc.*, 267 F.3d 793, 800 (8th Cir. 2001). The evidence must be viewed in the light most favorable to Mr. McBride at the summary judgment stage. Mr. McBride asserts that Adam Baldwin, Brett Smith, Michael Poole, and Perry (last name unknown) are potential comparators. The Court first examines Mr. Baldwin.

Mr. Baldwin is a Caucasian DYS employee who currently works in the system reform division as a system reform manager (Dkt. No. 22, ¶ 50). The system reform division was created to advance the cause of juvenile justice in the state by providing trainings for providers and all people in the juvenile justice system in Arkansas, unifying juvenile justice practices across the state, and developing relationships with national entities and bringing them into the state (*Id.*). Mr. Baldwin worked under the supervision of Mr. Nawoczyk, who is also a white employee (*Id.*, ¶¶ 50, 51).

Mr. McBride contends that both Mr. Baldwin and Mr. Nawoczyk were falsifying their time records by stating they were going to various facilities for the purpose of providing training when they were not (Dkt. No. 23, at 21). Mr. McBride submits that Ms. Mitchell-Davis and her team would go to the same facilities and did not see Mr. Baldwin's or Mr. Nawoczyk's names on the required sign-in sheets (*Id.*). Ms. Mitchell-Davis and her team asked the people at the facilities whether Mr. Baldwin and Mr. Nawoczyk had been there, and they were told that they had not (*Id.*). Mr. McBride further contends that there were times when Ms. Mosley-Sims did not know where Mr. Baldwin was, and she would call him on his cell phone to try and determine where he was (*Id.*). Mr. McBride submits that Mr. Baldwin would come "running down the street" to the office (*Id.*). Further, there is deposition testimony in the record from Ms. Mitchell-Davis that suggests

Ms. Mosely-Sims was aware of this alleged conduct on the part of Mr. Nawoczyk and Mr. Baldwin (Dkt. No. 22-4, at 16-17).

ADHS admits that Mr. Baldwin was disciplined by being ineligible for a merit-based salary increase and by receiving counseling for abuse of time allegations (Dkt. No. 14, ¶ 50; Dkt. No. 24, 7). ADHS admits that Ms. Mosley-Sims is Mr. Nawoczyk's supervisor (Dkt. No. 14, ¶ 51). However, ADHS attempts to distinguish Mr. Baldwin from Mr. McBride by arguing that Mr. McBride's job involved a different level of importance because Mr. McBride performed a confidential and information-sensitive job of assuring that the providers who directly deal with the children are complying with their contracts (Dkt. No. 24, at 6). ADHS argues that, when he performs audits, Mr. McBride is responsible for the direct safety of the children (*Id.*, at 6-7). ADHS contends that Mr. Baldwin was alleged to have falsified his time records, but ADHS contends that falsifying records does not directly affect the welfare and safety of the children (*Id.*, at 7).

As an initial matter, the Court determines that, construing the record evidence in the light most favorable to Mr. McBride, Mr. McBride has established that the same supervisor, Ms. Mosely-Sims, was involved in the incidents related to Mr. Baldwin and Mr. Nawoczyk and related to Mr. McBride. Further, the Court disagrees with ADHS's characterization of the different level of importance of Mr. McBride's and Mr. Baldwin's jobs with respect to the welfare and safety of children. ADHS admitted that the system reform division, where Mr. Baldwin works, provides training for providers and all people in the juvenile justice system in Arkansas, unifies juvenile justice practices across the state, and develops relationships with national entities and brings them into the state (Dkt. No. 14, ¶ 50). Mr. McBride submits that Mr. Baldwin's job includes going to various facilities to provide training (Dkt. No. 23, at 21). The Court determines based on the record

evidence before it that, when Mr. Baldwin falsified his time records by saying he had provided trainings at facilities when in fact he had not, he directly affected the welfare and safety of the children. Mr. Baldwin, like Mr. McBride, was found to have violated DHS Policy 1084 (Dkt. No. 23-5, at 27). While Mr. McBride was terminated, Mr. Baldwin received counseling for abuse of time allegations and was rendered ineligible for a merit-based salary increase. For these reasons, the Court finds that Mr. Baldwin's conduct is sufficiently similar to Mr. McBride's conduct and that Mr. Baldwin is a proper comparator at the pretext stage. This determination precludes the entry of summary judgment in favor of ADHS. There are genuine issues of material fact in dispute that should be submitted to a jury. The Court declines to examine the remaining comparators at the summary judgment stage, having determined that a genuine issue of material fact is in dispute which precludes the Court's granting summary judgment.

## IV. Conclusion

With respect to Mr. McBride's § 1983 claim, the Eleventh Amendment bars suits against state agencies by private citizens. Because Mr. McBride brought suit only against ADHS and not against any individuals who work at ADHS in their official capacity, the Court concludes that ADHS is entitled to summary judgment on Mr. McBride's § 1983 claim.

With respect to Mr. McBride's Title VII claim, the record evidence demonstrates that there are outcome determinative genuine issues of material fact in dispute. The role of the Court is to determine whether the non-moving party has produced evidence from which a jury could reasonably find in that party's favor. After carefully considering the record evidence and drawing all reasonable inferences in favor of Mr. McBride, the Court finds that a jury could reasonably find that ADHS's asserted reasons for terminating Mr. McBride were a pretext for race discrimination.

The Court concludes that ADHS is not entitled to summary judgment on Mr. McBride's Title VII race discrimination claim.

Therefore, the Court grants in part and denies in part defendant ADHS's motion for summary judgment (Dkt. No. 13). The Court dismisses with prejudice Mr. McBride's § 1983 claim against ADHS.

It is so ordered this 7th day of January, 2019.

_____
Kristine G. Baker
United States District Judge